IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 15-1729

———————————

TERESA FORD,

*Plaintiff – Appellant,*

v.

UNITED STATES OF AMERICA,

*Defendant - Appellee.*

———————————

Appeal from the United States District Court
for the Western District of North Carolina

*The Honorable Richard L. Vorhees, United States District Judge*

———————————

BRIEF OF THE DEFENDANT-APPELLEE

———————————

Jill Westmoreland Rose          Gill P. Beck
Acting United States Attorney   Assistant United States Attorney
                                United States Courthouse, Room 233
                                100 Otis Street
                                Asheville, North Carolina 28801
                                (828) 259-0645

*Attorneys for the Defendant-Appellee*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................iv

JURISDICTIONAL STATEMENT ..........................................................1

ISSUE PRESENTED ...............................................................................1

Did the district court clearly err in finding that the automobile accident at issue did not cause Ford new injuries or exacerbate her underlying condition, where the court weighed conflicting expert testimony and credited the opinions of highly-qualified experts, where the accident was minor, and where a co-worker observed no difference in Ford's pre- and post-accident behavior?.....................................................................1

STATEMENT OF THE CASE ...............................................................2

    A.    Ford is a passenger in an automobile operated by a federal employee when the car is involved in a minor "fender bender" ..................................................................................2

    B.    Ford had significant pre-existing medical conditions. ...........3

        1.   Beginning in the 1990s, Ford suffered from severe migraine headaches...........................................................3

        2.   In the early 2000s, Ford's migraine headaches and neck spasms increased, culminating in Ford seeking care from a neurologist five weeks before the car accident. .............4

        3.   Following the car accident, an MRI and X-ray did not produce any evidence of injury. .........................................9

        4.   After the accident, Ford worked full-time for more than two years, and her co-worker observed no difference between Ford's pre- and post-accident behavior. ............14

C.  Ford seeks damages for injuries she claims resulted from the car accident...........................................................................15

    1.  Ford testifies that she is unable to work as a result of the accident, but acknowledges on cross examination her history of headaches and neck spasms, and that she maintains an active lifestyle that includes more than an hour of daily exercise.......................................15

    2.  Dr. Hill testifies about his diagnosis of post-concussive headaches, but acknowledges Ford's pre-existing conditions, while the government presents the testimony of two board-certified physicians and an accident-reconstruction expert that contradict Dr. Hill's diagnosis of a post-concussive injury. ...............19

    3.  Other occupants of the vehicles testify that the accident was a minor "fender-bender." ........................30

    4.  Ford's co-worker testifies that she observed no difference in Ford's pre- and post-accident behavior. .30

    5.  Ford fails to object to the testimony of Dr. Cloninger during the trial or in post-trial briefs..........................31

D.  The district court finds that the accident did not cause Ford new injuries or contribute to a worsening of Ford's underlying condition. ............................................................32

SUMMARY OF THE ARGUMENT .......................................................36

ARGUMENT ........................................................................................38

I.  The district court did not clearly err in finding that the automobile accident did not cause Ford new injuries or contribute to a worsening of Ford's underlying condition.....................................38

iii

A.  Standard of Review ............................................................. 38

B.  Discussion............................................................................. 39

        1.  The district court's findings of fact were not clearly erroneous. .................................................................... 39

        2.  By failing to object to Dr. Cloninger's testimony during trial and in post-trial briefs, Ford waived any objection and cannot raise the issue for the first time on appeal. .................................................................. 51

CONCLUSION ...................................................................................... 57

REQUEST FOR DECISION ON THE BRIEFS WITHOUT
    ORAL ARGUMENT ...................................................................... 57

CERTIFICATE OF COMPLAINCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Anderson v. City of Bessemer City, N.C.*,
  470 U.S. 564 (1985)...................................................................47

*Bonds v. Mortensen and Lange*,
  717 F.2d 123 (4th Cir. 1983).....................................................56

*Brickwood Contractors, Inc. v. Datanet Engineering, Inc.*,
  369 F.3d 385 (4th Cir. 2004)....................................................54

*Byrd v. Southern Exp. Co.*,
  139 N.C. 273, 51 S.E. 851 (1905).............................................40

*DiPaola v. Riddle*,
  581 F.2d 1111 (4th Cir. 1978)...................................................52

*Fitzgerald v. Manning*,
  679 F.2d 341 (4th Cir. 1982)....................................................51

*Gilliken v. Burbage*,
  263 N.C. 317, 139 S.E.2d 753 (1965)........................................40

*Hendricks v. Cent. Reserve Life Ins. Co.*,
  39 F.3d 507 (4th Cir. 1994)...............................39, 41, 48, 51

*Hicks v. United States*,
  368 F.2d 626 (4th Cir. 1966).....................................................56

*Hurley v. United States*,
  923 F.2d 1091 (4th Cir. 1991)..................................................38

*Hutchinson v. Fidelity Inv. Ass'n*,
  106 F.2d 431 (4th Cir. 1939)....................................................53

*In re Celotex Corp.*,
  124 F.3d 619 (4th Cir. 1997)....................................................54

*Iodice v. United States*,
  289 F.3d 270 (4th Cir. 2002)....................................................39

*Lee v. Stevens*,
  251 N.C. 429, 111 S.E.2d 623 (1959)..................................39, 40

*Miller v. Mercy Hosp., Inc.,*
  720 F.2d at 356 (4th Cir. 1983) ......................................................... 43

*Phillips v. Crown Cent. Petroleum Corp.,*
  556 F.2d 702 (4th Cir. 1977)............................................................... 38

*Potts v. Howser,*
  274 N.C. 49, 161 S.E.2d 737 (1968)..................................................... 44

*Puckett v. United States,*
  556 U.S. 129 (2009)......................................................................53, 54

*Pullman-Standard v. Swint,*
  456 U.S. 273 (1982)............................................................................ 47

*Shrader v. White,*
  761 F.2d 975 (4th Cir. 1985)............................................................... 38

*Smith v. Whitley,*
  223 N.C. 534, 27 S.E.2d 442 (1943)..................................................... 39

*United States v. Heyer,*
  740 F.3d 284 (4th Cir. 2014)............................................. 39, 41, 43, 48

*United States v. Martinez-Melgar,*
  591 F.3d 733 (4th Cir. 2010)......................................................... 43, 46

*United States v. Maxton,*
  940 F.2d 103 (4th Cir. 1991)............................................................... 53

*United States v. Olano,*
  507 U.S. 725 (1993)......................................................................54, 55

*United States v. Seidman,*
  156 F.3d 542 (4th Cir. 1998)............................................................... 39

*United States v. Stevenson,*
  396 F.3d 538 (4th Cir. 2005)............................................................... 57

*United States v. Vogt,*
  910 F.2d 1184 (4th Cir. 1990)............................................................. 52

*Waffen v. U.S. Dep't of Health & Human Servs.,*
  799 F.2d 911 (4th Cir. 1986)............................................................... 38

*Yakus v. United States,*
  321 U.S. 414 (1944)............................................................................ 53

*Zolfaghari v. Sheikholeslami,*
  943 F.2d 451 (4th Cir. 1991)..............................................................52

**Statutes**

28 U.S.C. § 1291 ..............................................................................1
28 U.S.C. § 1346(b) ..........................................................................1
28 U.S.C. § 2671 ..............................................................................1

**Rules**

Fed. R. Civ. P. 52(a)........................................................................56
Fed. R. Civ. P. 52(a)(6) ..............................................................38, 47
Fed. R. Evid. 103(a)........................................................................52

## JURISDICTIONAL STATEMENT

Plaintiff Teresa Ford ("Ford") appeals the district court's entry of judgment in favor of the United States, following a bench trial, on Ford's claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.* Pursuant to 28 U.S.C. § 1346(b), the district court had jurisdiction over Ford's claim, and on May 14, 2015, entered judgment. J.A. at 655. On June 26, 2015, Ford timely filed notice of appeal. J.A. 669. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED

Did the district court clearly err in finding that the automobile accident at issue did not cause Ford new injuries or exacerbate her underlying condition, where the court weighed conflicting expert testimony and credited the opinions of highly-qualified experts, where the accident was minor, and where a co-worker observed no difference in Ford's pre- and post-accident behavior?

## STATEMENT OF THE CASE

**A.    Ford is a passenger in an automobile operated by a federal employee when the car is involved in a minor "fender bender."**

On October 7, 2009, Terry Ramsey, operations manager of the federally-operated W. Kerr Scot Dam and Reservoir, hosted a partnership tour of the area in Wilkes County, North Carolina.  J.A. at 23-25.  Ford, the executive director of the Friends of Kerr Scott Lake, was among those participating in the tour.  J.A. at 25.  Ford was the front-seat passenger in a Dodge Durango operated by Miriam Fleming, a United States Army Corps of Engineers ("USACE") employee.  J.A. at 25-26.  The Durango was following a van operated by Ramsey.  J.A. at 25.

At approximately 1:10 p.m., Ramsey started to turn onto New Browns Ford Road in Wilkesboro, North Carolina, and then stopped, resulting in a collision with the Durango.  J.A. at 26.  Ford, who was wearing a seatbelt at the time of the collision, indicated after the accident that she was not injured, as did all of the passengers.  J.A. at 297, 558.  Ford also called her supervisor and told him that she was "ok[ay]."  J.A. at 65, 565.  Chris Rapenchuck, a passenger in the Ford

2

Van, described the accident as a "minor fender bender," a "light impact," like being in a bumper car.  J.A. at 243.  Richard Ott, also a passenger in the Ford Van, characterized the impact as "minor." J.A. at 287. Fleming, the driver of the Durango, testified that the collision was "like being in a bumper car."  J.A. at 296.  Both Ramsey and Fleming were federal employees acting within the course of their federal employment, and the accident was caused by a negligent act or omission of a USACE employee.[1] J.A. at 26.

After the accident, Ford went back to the office, cancelled appointments for Ramsey, and then rejoined the tour group at the Fort Hamby Amphitheater.  J.A. at 63-65.  The tour group made at least two additional stops to view a check-in station and an amphitheater, with a considerable amount of walking involved.  J.A. at 245.

## B.    Ford had significant pre-existing medical conditions.

### 1.    Beginning in the early 1990s, Ford suffered from severe migraine headaches.

In the early 1990s, nineteen years before the automobile accident at issue, Ford began having migraine headaches.  J.A. at 71, 175.  By

---

[1] The United States did not stipulate or admit that the accident caused Ford any injury or that she was entitled to any damages as a result of this automobile accident.  J.A. at 26.

3

her own description, her migraine headaches were very serious and a big part of her life.  J.A. at 71-72, 175.  She described the onset of a migraine headache as "[s]mells, lights, you get such an excruciating pain you can't sit up.  You can't function.  You can't read.  You can't stand to read.  Your hair even hurts. . . . And you're throwing up, you can't stop throwing up and you eventually, if you don't get help you will dehydrate."  J.A. at 521.

The migraine headaches started in the back of Ford's neck and radiated into her head and left shoulder.  J.A. at 530-531, 536.  Ford's migraine headaches were "always a combo pack" involving both the neck and head.  J.A. at 536.

> **2.    In the early 2000s, Ford's migraine headaches and neck spasms increased, culminating in Ford seeking care from a neurologist five weeks before the car accident.**

For the five years before the accident, Ford regularly sought medical treatment for head and neck pain.  J.A. 575, 578, 580-612.  On June 4, 2004, for example, Ford sought medical care from Dr. William Bell for neck pain and a headache.  J.A. at 575-77.  Three months later, on September 21, 2004, she went to Dr. Giovanni Llibre for "chronic pain" of the neck.  J.A. at 578.  Six weeks after her first visit to Dr.

Llibre, Ford returned, seeking care for neck pain and a headache. J.A. at 580. Dr. Llibre noted, "As far as neck pain and shoulder pain goes she feels much better controlled with current regimen." J.A. at 580. Dr. Llibre continued Ford on Contin, an opioid, and noted that he "[w]arned patient about potential for addiction." J.A. at 580.

Six months later, on May 31, 2005, Plaintiff returned to Dr. Llibre, who noted that Ford complained of frequent headaches. J.A. at 587. On August 30, 2005, Ford again sought medical care for migraine headaches and neck pain. J.A. at 589.

On December 6, 2005, Ford sought medical care for a headache which had lasted a week. J.A. at 591. Three weeks later, on December 28, 2005, Ford again sought medical care for a headache that lasted for a week. J.A. at 592. Dr. Llibre noted in Ford's medical record that she had neck pain and a "headache for a week" with "diffuse throbbing associated with nausea and vomiting." J.A. at 592. Two days after seeing Dr. Llibre, on December 30, 2005, Ford saw Dr. Richard Yow, who noted, "Severe headaches and neck pain on the left side for several years." J.A. at 594.

On April 13, 2006, Ford again sought medical care from Dr. Llibre, who noted: "[p]ersistent neck pain posteriorly when she is not under the effect of pain meds, lots of stress . . . . Frustrated. Unable to sleep w/o the use of sedatives." J.A. at 595-96. Dr. Llibre further noted: "Today I had an extensive discussion with Theresa re: use and potential for misuse of narcotics and sedatives addiction (which I suspect exists already), options to come off these meds, evaluation of her understanding about this situation. She shows good insight however seems reluctant to dc [discontinue] meds at this time given the situation she is undergoing right now." J.A. at 596.

Three months later, on July 20, 2006, Ford saw Dr. Llibre for headaches and left shoulder pain. J.A. at 597. Dr. Llibre noted that Ford had "been feeling extremely anxious" and cried during her appointment "from feeling so frustrated and angry." J.A. at 597. Dr. Llibre noted further that by that time Ford had "taken several SSRIs [selective serotonin reuptake inhibitors] and [had] taken Effexor and she [said] she [could not] tolerate them." J.A. at 597.

On September 16, 2006, Dr. Llibre saw Ford for occipital migraine headaches and noted that she complained of headaches "for three days

. . . associated with vomiting and nausea . . . ." J.A. at 598. Dr. Llibre's assessment included headaches and cervicalgia. J.A. at 598.

Two months later, on November 18, 2006, Dr. Llibre saw Ford for headaches and neck pain and assessed Ford as having cervicalgia and opioid dependence. J.A. at 601. Dr. Llibre started Ford on methadone to treat her opioid dependence. J.A. at 601. On December 14, 2006, Dr. Llibre noted after a follow-up appointment to address neck pain, that the "methadone does relieve the pain but at the expense of multiple side effects including slurred speech and drowsiness." J.A. at 602. On March 15, 2007, Dr. Llibre noted that Ford "[was] still having muscle spasms" and that she was scheduled for surgery with Dr. Bell. J.A. at 606. He also noted that Ford wanted a refill for a rapid-acting narcotic prescribed by another physician, and he again assessed Ford as opioid dependent. J.A. at 606.

On March 21, 2007, Dr. Bell performed an anterior cervical discectomy and fusion at C5-6 on Ford. J.A. at 607. Three months later, on June 14, 2007, Ford saw Dr. Llibre for a headache, which Dr. Llibre described as a "headache for 1 day occipital," noting that it was associated with a dull aching  pain that was between 7 and 8 on the

7

scale of 10 . J.A. at 608. On July 16, 2007, Dr. Llibre documented that Ford complained of "high stress in the family," "feeling overwhelmed . . . most of the time," feeling sad and crying easily, feeling irritable and anxious, and having suffered from depression for three years. J.A. at 609. Based on these complaints, Dr. Llibre referred Ford for a psychiatry appointment. J.A. at 609.

On April 21, 2009, Dr. Llibre again saw Ford for headaches, and noted that Ford complained of suffering from a "headache for 3 days occipital, radiating to the neck associated with photophobia [and] phonophobia associated with nausea" and "tingling/numbness around the neck, frontal and occipital." J.A. at 610. Dr. Llibre's assessment was migraine and cervicalgia. J.A. at 610.

On August 31, 2009, five weeks before the car accident, Ford's migraine headaches and neck spasms had increased to the point where she sought care from Dr. Edward Hill, a neurologist. J.A. at 43, 355-58, 611-12. During her visit, Ford reported that both of her parents had suffered from headaches and that her mother suffered from mental illness. J.A. at 356. In his treatment notes Dr. Hill described Ford's history of migraine headaches and associated pain:

This is a 49-year old female who has had migraine-type headaches for about 19 years . . . . Ford does describe fairly typical migraine headaches that occur 4 or 5 times a month. She says perhaps 3 times a month they are severe enough that she has to go to the emergency room. . . . She does have mild left greater occipital nerve tenderness and some palpable cervical paraspinous spasm. . . .

IMPRESSION AND PLAN: This is a 49-year old female with:

1.    Typical migraine headaches. . . .
2.    Cervical muscular spasm. . . .
3.    Memory loss . . . .

J.A. at 611-12.

### 3.    Following the car accident, an MRI and X-ray did not produce any evidence of injury.

On October 9, 2009, two days after the accident, Ford saw Dr. Hill.

J.A. at 178, 613-14. Dr. Hill noted that Ford had not gone to the

emergency department, and he did not find evidence of spinal-cord

compression or nerve-root compression. J.A. at 178-79. Additionally,

Ford's motor examination was normal, and an x-ray and magnetic

resonance imaging ("MRI") reflected no evidence of neurological deficit.

J.A. at 179-80. Ford's reflexes were symmetrical with no indication that

there was anything affecting the strength of her muscles. J.A. at 178-

9

79.  Dr. Hill did not order a computed tomography ("CT") scan, J.A. at 613-14, 195-96, which is appropriate when there are signs of a concussion.  J.A. at 195.

Notwithstanding the negative X-ray and MRI, and decision not to order a CT scan, Dr. Hill diagnosed Ford with post-concussive headaches.  J.A. at 117, 617.  As he explained, "she had a whiplash type injury," which is "not really a diagnosis per se.  A more appropriate diagnosis is a post-concussive situation."  J.A. at 117.  When Dr. Hill saw Ford again on November 11, 2009, he noted that she had a post concussive headache, with a cervical component (J.A. at 117) and treated her with trigger point injections.  J.A. at 118, 617, 621-23, 646.

When the trigger point injections "failed to work, [Dr. Hill] asked permission from the insurance company to give [Ford] Botox."  J.A. at 119.  Botox is a form of botulinum toxin that blocks release of the neurotransmitter acetylcholine, which causes the muscle to fail to contract, thereby relaxing the muscle.  J.A. at 435-38.  During 2010, the Federal Drug Administration had approved Botox for treatment of torticollis and cervical dystonia and was investigating whether it would be approved for migraine headaches.  J.A. at 436-38.

On May 25, 2010, Dr. Llibre examined Ford's neck and found it to be supple. J.A. at 620. On September 7, 2010, BlueCross-BlueShield ("BCBS") denied the use of Botox for headaches because "Botox is considered investigational for [headaches]." J.A. at 352. On the BCBS denial of Botox for headaches, there is a handwritten note, "What next?" J.A. at 350. Underneath that note, there is a note, stating, "Can be approved for Dx [diagnosis] of cervical dystonia if we redo it & support this Dx meeting the above criteria. Your call. Most likely would involve new visit & Doc [documentation] of this Dx as well as notes regarding above Req. [requirement] as well as one predating the Dx." J.A. at 352.

The annual cost of Botox treatment was approximately $19,584. J.A. at 180-81. At that time, Botox was approved for torticollis,[2] a "spasm of the neck that cause[s] the head generally to tilt either to one side or the other," J.A. at 211, 470, and by including that diagnosis, BCBS would provide reimbursement for Botox, J.A. at 352, because it was generally accepted that Botox was effective in treating torticollis. J.A. at 470.

---

[2] "Torticollis" is generally interchangeable with "cervical dystonia." J.A. at 469.

Following BCBS's September 7, 2010 denial of reimbursement of Botox for headaches, on September 18, 2010, Dr. Hill's medical records for the first time indicated that Ford had "torticollis," and he wrote: "Ms. Ford returns today with worsening torticollis."  J.A. at 623. Thereafter, Dr. Hill routinely included torticollis/cervical dystonia in Ford's records.  On October 27, 2010, more than a year after the accident, Dr. William Patton noted, for the first time in Ford's records, that Ford had straightening of the cervical lordosis.  J.A. at 624.  On November 1, and 18, 2010, Dr. Llibre examined Ford and found her neck to be supple and did not note torticollis or neck spasm.  J.A. at 629, 630.

On January 28, 2011, Dr. Hill wrote, "So far, I have not gotten approval for Botox. . . .  "[u]nivocally, she should qualify for a trial of Botox for . . . elements of torticollis."  J.A. at 632.  On February 21, 2011, Dr. Llibre examined Ford's neck and found it to be supple and did not note torticollis or neck spasm.  J.A. at 633.  Dr. Llibre also noted: "The pharmacists told me that the pt [patient] has recently picked bumex and metoprolol from their store.  These were not the medications the pt had told our nurse she was taking.  In view of so much confusion,

12

I asked the pt to go home and read the names from the bottles of the medications she is currently taking." J.A. at 633-34.

On March 28, 2011, Dr. Llibre again examined Ford's neck and found it to be supple and did not note torticollis or neck spasm. J.A. at 199. On April 5, 2011, Dr. Bell, the neurosurgeon, who had previously performed Ford's anterior cervical discectomy and fusion, examined Ford's neck and found it to be supple and did not note torticollis or neck spasm. J.A. at 639. On May 2, 2011, Dr. Hill wrote, "Ms. Ford has continued problems with . . . . torticollis. . . . She has been approved, I believe, for Botox, and we will get her set up for that later this week." J.A. at 643. On May 4, and June 22, 2011, Dr. Llibre examined Ford's neck and found it to be supple and did not note torticollis or neck spasm. J.A. at 644, 645. On December 16, 2011, Dr. Llibre examined Ford's neck and found it tender to palpation but did not note any evidence of torticollis or neck spasm. J.A. at 647. On November 27, 2012, treatment note, Dr. Hill wrote, "Ms. Ford returns for Botox injections. . . . She tells me that the insurance carrier will honor an earlier repeat injection *if there is persistent documentation* . . . Please

note that the ongoing problems requiring Botox, including the cervical

dystonia . . . ." J.A. at 648 (emphasis added).

### 4. After the accident, Ford worked full-time for more than two years, and her co-worker observed no difference between Ford's pre- and post-accident behavior.

Ford continued working full-time for two years after the accident

J.A. at 42,52, 65, 251, 252, engaging in strenuous physical activities

that included lifting heavy objects, moving equipment, picking up

garbage from the roadside, and cleaning debris out of the lake, J.A. at

278-81. Ford also carried and planted large trees, installed tie-downs,

and spread mulch around the area. J.A. at 279-80. Ford's co-worker

Eileen Kerr did not notice any change in her ability to work. J.A. at

278-81. Ford never requested a workplace medical accommodation, and

her supervisor did not note that her headaches interfered with her

work. J.A. at 250-52.

Ford continued running her household after the accident,

maintaining an acre garden and seven acres of property, J.A. at 513,

and caring for animals, including four dogs and a miniature horse. J.A.

at 57-58. Because Ford's husband was one hundred percent disabled,

J.A. at 500-01, Ford took care of the pets and upkeep of the property

14

without help from anyone. J.A. at 516-17. Ford also continued running a landscaping business with a tractor, backhoe, and lawnmower, J.A. at 506, and a tree nursery of fifty to sixty trees, J.A. at 507, doing volunteer work a couple of hours a day, walking a mile, riding her bicycle for about thirty minutes, and swimming about thirty minutes a day. J.A. at 57-58, 549.

   C.   **Ford seeks damages for injuries she claims resulted ....
        from the car accident.**

On October 7, 2011, nearly two years after the car accident, Ford filed a FTCA administrative claim. J.A. at 2. A year later, on October 5, 2012, Ford filed a complaint in the district court, seeking compensation for injuries that she asserts resulted from the car accident. J.A. at 3.

   1.   **Ford testifies that she is unable to work as a result of
        the accident, but acknowledges on cross examination
        her history of headaches and neck spasms, and that
        she maintains an active lifestyle that includes more
        than an hour of daily exercise.**

On May 27, 2014, the district court, the Honorable Richard L. Voorhees presiding, conducted a bench trial of Ford's claims. J.A. at 31. Testifying in support of her claims, Ford described the accident, J.A. at 35, and claimed that as a result of the accident she could no longer

15

work.  J.A. at 53.  Ford acknowledged that beginning in 1990, she "got headaches and . . . kept them," and that when she got migraine headaches they caused vomiting and blurred vision and interfered with her ability to speak.  J.A. at 54.  Nevertheless, she testified that prior to the accident she "felt good" and was about to stop migraine headache medications.  J.A. at 54.

On cross examination, Ford admitted that five weeks before the accident, on August 31, 2009, she told Dr. Hill that she had suffered from migraine headaches for nineteen years and was having migraine headaches four to five times a month, neck spasms, and memory-loss problems.  J.A. at 94-96.  In describing her neck spasms, Ford testified that "[it was] like a muscle spasm that you would get in your leg," except that it was in her neck.  J.A. at 96.

Ford was repeatedly impeached during cross examination.  For example, in response to the question of whether migraine headaches could be inherited, Ford admitted that they could, but stated that only her mother had headaches.  J.A. at 72.  Ford was then asked about her deposition, taken on September 6, 2013, in which she  testified that neither her mother nor father had had headaches.  J.A. at 72-74.  In

16

response, Ford testified that after the deposition her older sister told her that their mother had headaches.  J.A. at 72-74.  When confronted with her intake sheet from her August 31, 2009, visit to Dr. Hill (four years before her deposition was taken), which reflected that she had reported that both of her parents had a history of headaches, Ford admitted "they both had strokes and they both had headaches. . . . They ate Goody Powders all the time.  That was the thing everybody took for headaches."  J.A. at 74, 356.

Similarly, when asked whether her parents had mental illness, Ford testified "not to my knowledge."  J.A. at 74-75.  Ford was again shown her intake sheet from her visit with Dr. Hill, in which she reported that her mother had mental illness.  J.A. at 75-76, 356.  Ford then explained, "I was just in a hurry in filling out this chart and I'm – I'm not one to say. I was wrong to put that there because I'm nobody to judge anybody if they have mental illness or not."  J.A at 75.

Ford also testified on cross examination that she did not remember that Dr. Llibre had counseled her about the misuse of narcotics and sedatives addiction, had diagnosed her as opioid dependent, and had treated her with methadone.  J.A. at 77-78.

17

Confronted with notes from her April 13, 2006 visit, J.A. at 596, with

Dr. Llibre in which he reported having had an "extensive discussion"

with Ford about the danger of an addiction that he suspected she

already had, Ford denied any dependency:  "I'm not addicted to pain

killers because I had to keep a family going.  I had to drive a car.  I had

to take care of people that couldn't fix their own food.  So if I was

addicted to pain killers, I wouldn't be here today."  J.A. at 87-89.  Ford

was then asked to read her November 18, 2006 medical record, J.A. at

601, that reflected a diagnosis of opioid dependence and an order that

she start methadone to treat that dependence.  J.A. at  91-91.

Addressing the car accident, Ford admitted that after the accident

she never lost consciousness, and she remembered specifics associated

with the accident.  J.A. at 60-62, 553-60.  Ford also admitted that she

returned to work on the day of the accident, worked the following day,

and worked full-time until December 2011, when her position was no

longer funded.  J.A. at 64-66.  Finally, Ford admitted that she walks a

mile a day, swims about 30 minutes, bikes about 30 minutes, feeds four

dogs and a horse, does volunteer work a couple of hours a day, and

operates a landscaping business and nursery of about 50-60 trees. J.A. at 57-59,70-71.

> **2.  Dr. Hill testifies about his diagnosis of post-concussive headaches, but acknowledges Ford's pre-existing conditions, while the government presents the testimony of two board-certified physicians and an accident-reconstruction expert that contradict Dr. Hill's diagnosis of a post-concussive injury.**

Testifying as part of Ford's case, Dr. Hill, a non-board-certified neurologist, J.A. at 112, testified that prior to the accident, Ford's headaches were under "good control." J.A. at 135. He also testified that the accident caused Ford to develop torticollis or cervical dystonia, J.A. at 155-56, as well as a straightening of the cervical lordosis. J.A. at 148-51.

On cross examination, Dr. Hill acknowledged that he had only treated Ford once before the accident, J.A. at 175, and that five weeks before the accident, Ford told him that she had been having migraine headaches for nineteen years, that they occurred four to five times a month, and that the migraine headaches were so severe that about three times a month she had to go to the emergency department for treatment. J.A. at 175-176. Dr. Hill admitted that Ford had cervical muscular spasms prior to the accident. J.A. at 177. Finally, Dr. Hill

admitted that when he examined Ford on October 9, 2009, two days after the accident, he did not find evidence of spinal-cord compression or nerve-root compression, her motor examination was normal, there was no indication of neurological deficit on her x-ray or MRI, and there was no evidence that anything was affecting her muscle strength. J.A. at 177-80.

David McCandless, an engineer, testified as an expert in mechanical engineering and accident reconstruction. J.A. at 304. He testified that the damage to the Durango was on the driver's side and not the passenger's side where Ford sat; the damage to the Durango was to the "softer part" of the Durango, which is made in substantial part of plastic, foam, and sheet metal; the air bag did not deploy; and the accident occurred at a maximum speed of between 8–11 miles-per-hour. J.A. 304, 306-22.

Dr. E. Wayne Massey, Professor of Medicine, Department of Neurology, Duke University School of Medicine ("DUMC"), testified as an expert in neurology and neuromuscular disease, based on his medical training and experience as a physician for the past thirty-five years at DUMC. J.A. at 370-74, 381, 488. Dr. Massey, who is board-

certified by the American Board of Psychiatry and Neurology, testified that Ford did not sustain any neurological deficit as a result of the accident. J.A. at 372-74, 426-28, 432-33, *see also* 382, 455-459. Addressing Dr. Hill's October 9, 2009 treatment notes, Dr. Massey testified that these notes reflected no "nerve or spinal cord or root injury." J.A. at 418, *see also* 416-17. Dr. Massey testified that Ford's "muscle testing was 100 percent," J.A. at 419, and that an x-ray of the cervical spine revealed "no abnormality." J.A. at 426.

Based on his review of Ford's records, including Dr. Hill's records dated October 9 (J.A. at 613), and November 11, 2009 (J.A. at 617), and the cervical spine x-ray (J.A. at 615) and MRI (J.A. at 618), Dr. Massey testified that no "neurologic deficit [was] documented." J.A. at 427; *see also* 417-428, 431-33. Dr. Massey noted, in particular, that Ford's December 31, 2009 MRI confirmed that "there[ was] no new deficit and the [s]pinal cord signal and everything seem[ed] to be okay . . . ." J.A. at 433. Distinguishing between symptoms and findings, Dr. Massey testified, "let me just reiterate . . . there's no neurologic deficit that [Dr. Hill] has ever reported or that I could find. But headache pain and cervical pain . . . they're symptoms. So [Dr. Hill] he's commenting on

symptoms, not findings. . . . he never mentions findings here. He just talks about . . . her symptoms." J.A. at 494. Massey concluded that based on a review of Dr. Hill's records, the automobile accident did not cause Ford any cervical spine injury. J.A. at 444. He testified: "It is my opinion that they never found any new neurological deficits after the accident of . . . motor, sensory, reflexes, by his examination, multiple examinations, or by C-spine film and the EMG." J.A. at 490.

Dr. Massey also testified that the automobile accident did not cause a neck injury:

> Well, clearly and obviously she had cervical spine disease long before [the accident], both by complaints for years but also a previous surgery. So she had cervical spine disease when this happened. . . . I don't think that her cervical spine disease was caused by the automobile accident. I don't believe there's any evidence [of] that . . . clearly, she had cervical spine disease prior to this.

J.A. at 444-45. Dr. Massey noted that five weeks before the accident, Dr. Hill determined that Ford had cervical spasm, J.A. at 396-97, 399, and that Dr. Llibre had diagnosed Ford as having cervical spasms or cervicalgia on a number of occasions, including April 21, 2009, June 15, 2007, December 14, 2006, September 16, 2006, April 13, 2006, December 6, 2005, and August 30, 2005. J.A. at 402-03, 407-13; *see also*

455-58.  Dr. Massey noted that "[m]uscle spasms are nonspecific, and you get them from a lot of things."  J.A. at 486.  Dr. Massey rejected Dr. Hill's opinion that the muscle spasms were causally related to the accident and the alleged flexion/extension injury, "I don't think there's . . . cause and effect because she had so much previous disease."  J.A. at 462, 464-65.

Addressing Ford's headaches, Dr. Massey opined that they were not caused by the car accident:  "She had a lot of headaches prior to this, for years," but there were never new neurological deficits present after the accident.  J.A. at 445.  Dr. Massey testified that "a large percentage of migraine patients will have a family history of migraine," and that "[w]e used to say 90 percent" of patients with migraines had a family history of migraines.  J.A. at 393.  Dr. Massey testified that prior to the accident, Ford had a "severe problem" with migraine headaches, occurring four to five times a month and that "[h]aving to go to the emergency room three times a month is . . . pretty extreme."  J.A. at 387.  Regarding Dr. Hill's assertion that Ford's migraine headaches were "controlled" prior to the accident, Dr. Massey testified:  "Clearly, she had a lot of headaches prior to this, for years. I don't think they . . .

23

sound like they're controlled," J.A. at 445, "having to go to the ER [emergency room] several times a month . . . . That isn't good control." J.A. at 466, 494. Dr. Massey also testified that Ford suffered no new deficits as a result of the accident. J.A. at 445, 459-60.

Concerning Dr. Hill's diagnosis of a post-concussive injury, Dr. Massey opined that the accident did not cause any post-concussive injury. J.A. at 426. Dr. Massey testified that because there was no blow to the head, any headaches Ford experienced were not post-concussive headaches: "She may clearly have had a headache, but it wasn't from a concussion the way we generally think of a blow to the head." J.A. at 426.

Addressing Dr. Hill's diagnosis of torticollis eleven months after the car accident, Dr. Massey testified that there was no causal relationship between the accident and torticollis. J.A. at 441-42. Dr. Massey noted that the x-ray did not indicate torticollis, that Dr. Hill did not do electrodiagnostic testing to confirm torticollis, that Dr. Hill did not describe the torticollis, but just made a "statement," and that Dr. Hill injected Ford around the scapula, which is not appropriate for

torticollis because "[t]orticollis doesn't involve the scapula in isolation."
J.A. at 434, 437, 439-40, 442-43.

Dr. Massey explained that epidemiological studies indicate that in
most instances of torticollis "there's no history of trauma," but when
there is an association, "[i]t's not months later.  It's within days."  J.A.
at 441.  Dr. Massey further elaborated, "[Y]ou can't say that a year
before someone has a whiplash and then a year later gets . . . torticollis .
. .  that's just not cause and effect. . . ."  J.A. at 443.  As Dr. Massey
further explained, DUMC treats many patients with torticollis and "as
a rule there's not a preexisting neck injury."  J.A. at 472.  With regard
to Dr. Hill's testimony that a whiplash-type injury caused Ford's
torticollis, Dr. Massey testified that he disagreed, and further stated, "I
don't believe that we have good evidence that cervical whiplash injuries
cause cervical dystonia . . . ."  J.A. at 480-81.  As Dr. Massey further
testified, "Despite the fact that . . . Dr. Hill thinks there's a relationship,
it is not an obvious relationship and it is unusual to blame a cervical
injury on causing torticollis. . . .  I'm just saying it's not common in the
epidemiology of that disease."  J.A. at 490, 491.  Additionally, based on
the lack of electrodiagnostic testing, the absence of evidence on x-ray,

the lack of description of torticollis, and Dr. Hill's injection of Botox into the scalp instead of the area normally used to treat torticollis, Dr. Massey stated: "I'm not sure she even has torticollis."  J.A. 443.

Regarding preexisting medical conditions, Dr. Massey testified, "[t]he records that I . . . reviewed and spent quite a bit of time [with] indicate to me that there was preexisting disease and there were no new deficits."  J.A. at 452; 488-89.

Dr. Kenneth Cloninger, a board-certified neurosurgeon, testified that the automobile accident did not cause Ford any injury.  J.A. at 191, 226-29.  Dr. Cloninger was uniquely qualified to review Ford's extensive medical history, which covered nearly two decades, not only because of his neurosurgery board-certification and forty years of medical experience, but also because on a monthly basis he reviews fifteen to twenty Social Security disability cases and provides medical opinions and testimony in those cases to Social Security administrative law judges.  J.A. at 191.  Noting that the motor vehicle accident did not produce any objective medical findings that Ford sustained any injury as a result of the accident, Dr. Cloninger testified that the accident did not cause a concussion, "any problem at all with the cervical spine,"

26

torticollis, headaches, or cervical spasm.  J.A. at 206, 211, 226-29.  He

further testified that Ford's migraine headaches and cervical spasms

pre-existed the accident.  J.A. at 227-29.  Dr. Cloninger opined, based on

Ford's reporting to Dr. Hill that she suffered headaches four to five

times a month, requiring emergency evaluation three times a month,

that her headaches were not under "good control" at the time of her

accident.  J.A. at 203.

Like Dr. Massey, Dr. Cloninger rejected Dr. Hill's diagnosis of a

post-concussive injury, testifying that a diagnosis of a concussion

requires loss of consciousness, confusion, and amnesia.  J.A. at 226.  He

opined that based on a review of the medical records and Ford's

deposition, she did not have any of the symptoms that would support a

diagnosis of a concussion: "She did not lose consciousness.  There was

no state of confusion at any point along the way.  And there was no

evidence of amnesia through the chain of events from before she left the

office on through . . . the rest of the evening.  There was no hiatus or no

break in that chain of events so that there was no evidence of any

amnesia at all.  I don't think she had a concussion because of that."  J.A.

at 226-27; *see also* J.A. at 195.  Dr. Cloninger concluded that because

Ford did not have a concussion, "she could not have [had] a post-concussive headache."  J.A. at 200.

Dr. Cloninger testified that Dr. Hill's decision not to order a CT scan of the brain following the accident supports his conclusion that Ford did not suffer a concussion:  "[I]f there were signs of a concussion, the next thing you would do, you would get a CT scan of the brain."  J.A. at 195.  Dr. Cloninger also explained that there was no evidence that the car accident caused the kind of head injury that could result in a concussion:

> In an automobile accident, you'd expect two ways that you could get a head injury . . . . Number one would be if the head struck either the dashboard or the front of a windshield or the right side windshield.  That would ---- could possibly cause a concussion. The second way would be if anything in the vehicle had come loose and had acted as a projectile, a package of some kind had acted as a projectile and hit the patient in the head.  That would be the two ways.  The flexion and extension of a whiplash, it's theoretically possible but practically impossible to get a concussion from that kind of activity.  The only time I've ever seen a concussion or contusion, are two babies that were actually whipped.  The shaken baby syndrome it's called.  And they both had contusions and one of them even had a brain laceration.  But in the adult it's just physically impossible for that kind of head movement, flexion/extension, to cause a whiplash type injury.

J.A. at 200-01.  Dr. Cloninger concluded:  "I think we've shown conclusively that there was absolutely no concussion at the time of the

accident.  If there was not a concussion, there could be no post-

concussion headache. . . . [T]he mechanism that was supposed to have

caused the concussion did not occur."  J.A. at 229.

Also consistent with Dr. Massey, Dr. Cloninger rejected a

relationship between the automobile accident and torticollis:

> I don't think you can wait 11 months to have any sort of
> torticollis.  That would occur within the first couple of days,
> certainly within a week or so after the accident itself. . . .
> there's no association between that particular automobile
> accident and the diagnosis of torticollis September 18th,
> 2010.

J.A. at 211.  Dr. Cloninger noted that other doctors who examined Ford

found that her neck was supple, and there was no indication of

torticollis.  J.A. at 211-15.  For example, Dr. Llibre found on November

1 and 18, 2010, and on February 21 and March 28, 2011, that Plaintiff's

neck was supple, which meant she had full range of motion, with no

spasm.  J.A. 211-15, 629, 630, 633, 638.  On April 5, 2011, Dr. Bell, the

neurosurgeon who had performed Ford's anterior cervical discectomy,

examined Ford's neck, noting that her neck was "supple."  J.A. at 639.

As Dr. Cloninger testified, "I feel quite certain any neurosurgeon would

give a thorough assessment of the neck having done previous surgery on

the neck."  J.A. at 216.  Dr. Cloninger also rejected Dr. Hill's testimony

29

that the accident caused a loss of normal cervical lordosis, explaining that neither the x-rays nor the MRI showed any evidence of spasm and that a straightening of the lordosis diagnosed more than a year after the accident was "too late in [his] judgment to be associated or . . . caused by [the] accident." J.A. at 211-12.

### 3. Other occupants of the vehicles testify that the accident was a minor "fender-bender."

Chris Rapenchuck, a passenger in the Ford Van, described the accident as a "minor fender bender," a "light impact," like being in a bumper car, and testified he was not injured. J.A. at 243. Richard Ott, also a passenger in the Ford Van, characterized the impact as "minor in my mind," and remembers being "thrown back a bit," but did not sustain any injury. J.A. at 287. Fleming, the driver of the Durango, testified that the collision was "like being in a bumper car." J.A. at 296.

### 4. Ford's co-worker testifies that she observed no difference in Ford's pre- and post-accident behavior.

Ford continued working full-time for two years after the accident, and her co-worker Eileen Kerr did not notice any change in her ability to work. J.A. at 279. Ford's supervisor Michael Kennedy testified that Ford never requested a workplace medical accommodation, and he did

not note that her headaches interfered with her work. J.A. at 250-52.

Kerr testified about Ford's physical activities both before and after the

accident, and stated, "I did not see any change from when we began

working together to what she was capable of doing after the accident."

J.A. at 279. Kerr testified that Ford engaged in strenuous physical

activities, including lifting heavy objects, moving equipment, picking up

garbage from the roadside, and cleaning debris out of the lake. J.A. at

278-81. Ford picked up and planted trees, which were large, measuring

between six and seven feet tall, with a root ball, and were heavy and

sizable. J.A. at 279. Ford carried and planted large trees, installed tie-

downs, and spread mulch around the area. J.A. at 279-280. Another co-

worker, Miriam Fleming, testified that prior to the accident, from

March 2003 to December 2007, Ford "complained of [migraine

headaches] quite frequently . . . . Probably one or two times a week."

J.A. at 301.

### 5.    Ford fails to object to Dr. Cloninger's testimony during the trial and in post-trial briefs.

During the trial, Ford did not object to Dr. Cloninger's testimony.

J.A. at 190-239. Following the trial, the district court provided the

parties the opportunity to submit a written closing argument brief,

31

proposed findings of fact, and reply brief. Two months after the trial, with the benefit of the trial transcript, Ford did not raise the issue of the competence of Dr. Cloninger's testimony in her closing argument (ECF No. 48), proposed findings of fact (ECF No. 49), or reply brief (ECF No. 53). Instead, Ford argued that Dr. Hill's testimony was more persuasive than Dr. Cloninger's and Dr. Massey's testimony. ECF No. 48, 49, 53.

### D. The district court finds that the accident did not cause Ford new injuries or contribute to a worsening of Ford's underlying condition.

After "carefully considering all testimony and arguments presented at trial of this matter, and taking into account the credibility and accuracy of the testimony and other evidence, and studying the applicable law," the district court found that Ford was not entitled to judgment because Ford had failed to prove that the accident "cause[ed] new injuries or otherwise contribute to a worsening of Ford's underlying condition." J.A. at 655, 663. The district court found that following the accident, all of the passengers, including Ford, indicated that they were not injured, and that Ford reported "no loss of consciousness, state of confusion, or amnesia as a result of the collision." J.A. at 658. The

court noted that Ford did not go the emergency room after the accident," and that neither an x-ray two days after the accident nor an MRI three months after the accident showed any evidence of injury. J.A. at 660-61. The district court also found that "Ford continued working the day of the accident and continued in her full-time position . . . for two years until funding for her position lapsed in December 2011." J.A. at 658.

Addressing Ford's pre-existing medical conditions, the district court found that Ford had significant pre-existing medical conditions, and that "Ford's condition was deteriorating prior to the accident." J.A. at 658-64. The court found that Ford's deteriorating condition was "evidenced by her decision to see a specialist – Dr. Hill – rather than deciding to see Dr. Llibre" just five weeks before the accident. J.A. at 662. The district court reviewed the medical records related to Ford's August 2009 visit to Dr. Hill, noting that during this visit Ford reported a 19-year history of migraine headaches and that she suffered from headaches four to five times a month, requiring emergency treatment three times a month. J.A. at 660. The district court also noted that

"Dr. Hill assessed Ford with migraines, cervical muscular spasm, and memory loss." J.A. at 660.

The district court found, based on McCandless's expert testimony, that the closing speed of the two vehicles at the time of impact was between eight and eleven miles-per-hour, and that the "Durango's safety features, namely its plastic and foam components, absorbed much of the impact." J.A. at 662-64. The district court also noted that its finding was "substantiated by McCandless' opinion as well as lay witnesses who were inside the vehicles involved in the accident." J.A. at 664. The district court explicitly rejected Ford's account of the severity of the accident and credited the other passengers' testimony that the accident was minor and the impact consistent with a "fender bender." J.A. at 664. The district court concluded that the "accident was minor in nature." J.A. at 664. Crediting Kerr's testimony that following the accident Ford continued to be able to lift heavy trees and bushes, spread mulch, and engage in the same work-related activities that she had before the accident, the district court rejected Ford's claim that the accident caused injury that prevented her from working. J.A. at 664.

Addressing the medical expert testimony, the district court found that "Dr. Cloninger was more persuasive and credible than Dr. Hill in the context of their respective testimonies and all of the evidence in the case." J.A. at 664. The district court found specifically that "Dr. Cloninger's testimony regarding objective findings pre- and post-accident were more persuasive than Dr. Hill's . . . ." J.A. at 664. Explaining its decision to credit Dr. Cloninger's expert opinion over Dr. Hill's testimony, the district court made eleven specific findings:

(1)    There were no objective medical findings supporting causation;

(2)    Ford did not have any indicators that she experienced a concussion as a result of the accident;

(3)    Dr. Hill did not order a CT scan after the accident, as would be expected if the patient had a concussion;

(4)    Where torticollis results from trauma, it develops within days, not months, after the trauma, and Ford did not devlop torticollis as a result of the accident;

(5)    The straightening of the cervical lordosis would not occur months after the accident, and the straightening in Ford's case was not caused by the accident;

(6)    A condition requiring multiple emergency-room visits a month is not under good control, and Ford's condition was not meaningfully under control prior to the accident;

35

(7)    Spurling's sign was absent two days after the accident,
which indicates that there was no significant compression on
the cervical nerves;

(8)    Lhermitte's sign was absent two days after the accident,
which indicates that there was no spinal cord compression;

(9)    Headaches, including occipital headaches, occurred prior to
the accident;

(10)    Neck and shoulder spasms occurred prior to the accident;
and

(11)    Dr. Hill's assertion of a whiplash-type injury is inconsistent
with the finding from the October 10, 2009 x-ray indicating
no subluxation and extension and consequently no stretching
of any ligaments that would allow excessive motion of the
neck.

J.A. at 665-66.

Based on these evidentiary assessments and credibility

determinations, the district court found that "[t]he accident did not

cause the injuries that Ford claims."  J.A. at 666.  The district court

found further that "[t]he collision did not proximately cause [Ford's]

alleged injuries," and "[a]ccordingly, [that] Ford may not recover under

the FTCA."  J.A. at 667-68.

## SUMMARY OF THE ARGUMENT

The district court did not clearly err in finding that the automobile

accident did not cause Ford new injuries or contribute to a worsening of

Ford's underlying condition. The court made eleven specific findings

related to its ultimate determination that there was no proximate cause

between the accident and any injury, and these findings were based on

medical records documenting Ford's substantial pre-existing medical

conditions, the minor nature of the accident, a co-worker's observation

that there was no difference in Ford's pre- and post-accident behavior,

and the testimony of eminently qualified physician experts. Because

the district court's findings of fact were amply supported by the

evidence considered in the light most favorable to the United States,

they are not erroneous, much less clearly erroneous.

The district court also did not plainly err in admitting Dr.

Cloninger's testimony. Although Ford asserts that some of Dr.

Cloninger's opinions were not proper expert testimony, she waived any

right to challenge this testimony by failing to object to the testimony

during the trial and in post-trial briefs. Additionally, Ford has failed to

identify any legal error, much less plain error, in the admission of this

testimony. Dr. Cloninger's opinions were supported by a thorough

examination of Ford's medical records, and an analysis of those records

based on forty years of medical experience as a board-certified neurosurgeon.

Ford received a fair trial, and the district court's judgment was based on findings of fact that were well supported. Accordingly, the district court's judgment should be affirmed.

## ARGUMENT

**I.    The district court did not clearly err in finding that the automobile accident did not cause Ford new injuries or contribute to a worsening of Ford's underlying condition.**

### A.    Standard of Review.

"In FTCA cases, which are tried without a jury, factual determinations . . . are governed by the clearly erroneous standard of review." *Waffen v. U.S. Dep't of Health & Human Servs.*, 799 F.2d 911, 919 (4th Cir. 1986), *abrogated on other grds.*, *Hurley v. United States*, 923 F.2d 1091, 1094 n.12 (4th Cir. 1991); *see also* Fed. R. Civ. P. 52(a)(6). In applying the clear-error standard, "an appellate court . . . must 'accord wide latitude to the findings of the trial court with respect to the credibility of witnesses, and to facts and inferences therefrom.'" *Shrader v. White*, 761 F.2d 975, 980 (4th Cir. 1985) (quoting *Phillips v. Crown Cent. Petroleum Corp.*, 556 F.2d 702 (4th Cir. 1977)). "In

38

particular, 'evaluating the credibility of experts and the value of their opinions is a function best committed to the district courts, and one to which appellate courts must defer.'" *United States v. Heyer*, 740 F.3d 284, 292 (4th Cir. 2014) (quoting *Hendricks v. Cent. Reserve Life Ins. Co.*, 39 F.3d 507, 513 (4th Cir. 1994)).  In reviewing the District Court's findings of fact under the clearly erroneous standard, the evidence is construed in the light most favorable to the prevailing party below. *United States v. Seidman*, 156 F.3d 542, 547 (4th Cir. 1998).

## B.    Discussion

### 1.    The district court's findings of fact were not clearly erroneous.

"In this federal torts claim action, arising out of events in North Carolina, the law of that state controls." *Iodice v. United States*, 289 F.3d 270, 274 (4th Cir. 2002).  Under North Carolina law, the "burden [is] upon the plaintiff to show defendant's . . . negligence proximately caused" her injuries. *Lee v. Stevens*, 251 N.C. 429, 433, 111 S.E.2d 623, 627 (1959); *Smith v. Whitley*, 223 N.C. 534, 535, 27 S.E.2d 442, 443 (1943) (plaintiff has the burden of establishing "the connection of cause and effect").

"The fact that the defendant has been guilty of negligence, followed by an injury, does not make him liable for that injury, which is sought to be referred to the negligence, unless the connection of cause and effect is established; and the negligent act of the defendant must not only be the cause but the proximate cause, of the injury." *Lee*, 251 N.C. at 433, 111 S.E.2d at 627 (quoting *Byrd v. Southern Exp. Co.*, 139 N.C. 273, 51 S.E. 851, 851 (1905)); *see also Gilliken v. Burbage*, 263 N.C. 317, 139 S.E.2d 753, 759 (1965) ("To hold a defendant responsible for a plaintiff's injuries, defendant's negligence must have been a substantial factor, that is a proximate cause of the *particular* injuries for which plaintiff seeks recover.")(emphasis in original).

In this case, the district court found that "Dr. Cloninger was more persuasive and credible than Dr. Hill in the context of their respective testimonies and all of the evidence in the case." J.A. at 664. This conclusion was based on eleven specific findings of fact, each of which was supported by specific medical evidence and/or witness testimony. The district court noted the lack of any objective findings supporting a causal connection between the car accident and any injury suffered by Ford, particularly noting the lack of any of the objective medical

40

findings that would indicate a concussion that might have supported Dr. Hill's diagnosis of a post-concussive injury. Reasonably relying on the expert testimony of both Dr. Massey and Dr. Cloninger, the district court found that there was too much time between the date of the accident and the first mention in Ford's medical records of torticollis or a straightening of the cervical lordosis to support a causal association between the accident and either of those conditions. And, the district court properly rejected Ford's testimony that her headaches and pain were well controlled at the time of the accident, noting that this testimony was inconsistent with Ford's account of the severity and frequency of her migraine headaches and neck spasms five weeks before the accident when she sought medical treatment from a specialist instead of continuing to seek care from Dr. Llibre.

The district court's findings of fact are well-grounded in evidence, involve credibility determinations, and are the product of a careful weighing of conflicting expert testimony to which this Court should defer. *See Heyer*, 740 F.3d at 292; *see also Hendricks*, 39 F.3d at 513. In addition to the medical-expert testimony, the district court's finding of no causal connection between the accident and any of Ford's medical

conditions is supported by: (1) the testimony of the other passengers in the Durango that the accident was a minor "fender bender" and did not result in a hard impact; (2) the testimony of the accident-reconstruction expert that the Durango was traveling a maximum of between 8 and 11 miles-per-hour at the time of impact, the damage to the Durango was on the driver's side door, the air bag did not deploy, and the "soft part" of the Durango absorbed most of the impact; (3) Kerr's testimony that for two years after the accident Ford was able to engage in the same physically demanding work activities as she was able to perform before the accident; (4) Ford's admission that after the accident she continued running her household, maintaining the property, caring for numerous animals, running a landscaping business, doing volunteer work, and exercising at least an hour a day; (5) the correlation between BCBS's denial of approval for Dr. Hill's prescription of Botox and the first mention of a diagnosis of cervical dystonia, as well as the notations that Botox would be approved if Ford were diagnosed with that condition; and (6) the physical findings of Ford's other treating physicians, Dr. Bell and Dr. Llibre, in the year and-a-half after the accident that Ford's

neck was supple, a finding that was inconsistent with a diagnosis of torticollis.

In challenging these findings as clearly erroneous, Ford asserts that the United States "did not present any competent evidence to refute Dr. Hill's initial diagnosis of the injuries suffered by Ms. Ford in the collision." Pl. Br. at 8, 10. But, this assertion fails to consider Drs. Massey's and Cloninger's testimony as a whole that none of Ford's medical conditions were caused by the accident but in fact were pre-existing conditions. *See Heyer*, 740 F.3d at 292 (in reviewing a district court's decision under Fed. R. Civ. P. 52(a) the appellate court considers whether "the evidence is plausible in light of *the record viewed in its entirety*")(emphasis added); *United States v. Martinez-Melgar*, 591 F.3d 733, 738 (4th Cir. 2010)("clear error occurs when a district court's factual findings 'are against the clear weight of *the evidence considered as a whole*.'")(quoting *Miller v. Mercy Hosp., Inc.*, 720 F.2d at 356, 361 (4th Cir. 1983)(emphasis added)).

Under North Carolina law, a defendant is not liable for pre-existing medical conditions. As the Supreme Court of North Carolina has explained:

43

> [When] injuries are aggravated or activated by a pre-existing condition, defendant is liable only to the extent that the wrongful act proximately and naturally aggravated or activated plaintiff's condition. The defendant is not liable for damages . . . attributable solely to the original condition.

*Potts v. Howser*, 274 N.C. 49, 161 S.E.2d 737, 742 (1968)(citations and quotations omitted).  In this case, the district court, based on the expert testimony of Dr. Massey, J.A. at 387, 402-03, 407-13, 444-45, 452, 455-60, 462, 464-66, 488-89, 494, and Dr. Cloninger, J.A. at 191, 203, 206, 211, 226-29, and after considering the evidence in its entirety, found that "the accident in question did not cause new injuries or otherwise contribute to a worsening of Ford's underlying condition.  As documented above, Ford had significant pre-existing conditions." J.A. at 663-64. The district court's findings are supported by the preponderance of the evidence and are not clearly erroneous.

Dr. Massey testified, based on his review of Ford's medical records, including the x-rays and MRI taken within a few months of the accident, that there was no indication of any new injury and that the records, instead, supported the conclusion that Ford's cervical spine disease and headaches pre-existed the car accident.  J.A. 387, 402-03, 407-13, 444-45, 452, 455-58, 462, 464-65, 488-89.  Specifically, Dr.

44

Massey testified, to a reasonable degree of medical certainty, J.A. at

382, 488-89, that the accident did not cause (1) any nerve or spinal cord

or root injury, J.A. at 416-18, (2) any neurological deficit, J.A. at 417-28,

431-33, 490 (3) any spinal cord injury, J.A. at 444, (4) any neck injury,

J.A. at 444-45, (5) any neck spasms, J.A. at 396-97, 399, 402-03, 407-13,

455-58, 462, 464-65, 486, (6) any migraine headaches, J.A. at 387, 393,

445, 459-60, 466, 494, (7) post-concussive headache, J.A. at 426,  or (8)

torticollis or cervical dystonia, J.A. at 434, 437, 439-40, 441-43, 472,

480-81, 490-91.   Similarly, Dr. Cloninger testified, based on his forty

years of "experience in the field of neurosurgery," J.A. at 191, 238, that

the accident did not cause (1) a concussion, J.A. at 200-05, (2) "any

problems at all with the cervical spine," J.A. at 206-07, (3) torticollis,

J.A. at 211-12, 215, (4) migraine headaches, J.A. at 227-28, (5) cervical

spasms, J.A. at 227-28, or any other injury as a result of the accident,

J.A. at 228-29.  In challenging Dr. Hill's diagnosis of a post-concussive

injury to Ford, both Drs. Massey and Cloninger testified that there was

no evidence that Ford suffered any of the objective symptoms of a

concussion and concluded logically that without a concussion there

could be no post-concussive injury.

Although Ford latches onto language such as "I don't think" and "judgment" in the opinions articulated by Dr. Cloninger, *see* Pl. Br. at 10-11, 15, when read fairly and "considered as a whole," *Martinez-Melgar*, 591 F.3d at 738, Dr. Cloninger provided clear, well-reasoned opinions that Ford's headaches and neck spasms, as well as any torticollis and straightening of the cervical lordosis, were not caused by the car accident.  An example of how Dr. Cloninger used "I think" to express an unequivocal opinion is when he countered Dr. Hill's testimony that the accident caused post-concussive headaches, by testifying "I think we have shown conclusively that there was absolutely no concussion at the time of the accident," J.A. at 229, and this well-reasond and unequivocal opinion was based on Dr. Cloninger's forty years of "experience in the field of neurosurgery."  J.A. at 238. Similarly, Dr. Massey provided well-reasoned and well-supported opinions, based on "a reasonable degree of medical certainty," J.A. at 382, 488-89, that the accident did not cause Ford injury.  The district court could properly rely on these opinions and did not clearly err in doing so.

Ford also asserts generally that "the physician who actually examines and treats a patient is in a better position to diagnose the cause of the patient's ailments," Pl. Br. at 10, but the clear-error standard of review vests in the district court the responsibility for making determinations about which witness is more believable, which witness's opinions are better supported, and which witness's opinions should ultimately be credited. Rule 52(a)(6), Federal Rules of Civil Procedure, does not create a hierarchy of witnesses, as Ford proposes, with predetermined credibility assessments. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985)("That the Rule goes on to emphasize the special deference to be paid credibility determinations does not alter its clear command: Rule 52(a) 'does not make exceptions or purport to exclude categories of factual findings from the obligation of a court of appeals to accept a district court's unless clearly erroneous.'")(quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982)).

Instead, Rule 52(a) entrusts the district court to make those credibility determinations, and "the reviewing court must give due regard to the trial court's opportunity to judge the witnesses'

47

credibility." Fed. R. Civ. P. 52(a)(6).  The district court in this case exercised its authority to make those determinations, and its decision to credit the expert opinions of Dr. Massey, a board-certified neurologist with over thirty-five years of experience at DUMC (J.A. at 372-79), and Dr. Cloninger, a board-certified neurosurgeon with forty years of medical experience, and substantial experience as a medical expert in Social Security disability cases (J.A. at 191), is well-grounded in the evidence presented at trial and entitled to deference.  *Heyer*, 740 F.3d at 292 ("In particular, evaluating the credibility of experts and the value of their opinions is a function best committed to the district courts, and one to which appellate courts must defer.")(quotations and citations omitted); *Hendricks*, 39 F.3d at 513 ("An appellate court should be especially reluctant to set aside a finding based on the trial court's evaluation of conflicting expert testimony.").

Ford also argues that the district court clearly erred in finding that Ford's torticollis and the straightening of her cervical lordosis were not caused by the accident, asserting that the medical records reflect only that these conditions were diagnosed approximately a year after the accident, not that they did not exist until that time.  The district

48

court could reasonably conclude, however, that a condition that was not diagnosed until a year after an accident was not caused by the accident, particularly where there is no medical evidence that the condition, in fact, existed near the time of the accident.  In this case, as Dr. Massey noted, the x-rays taken two days after the accident did not show any indication of torticollis, and Dr. Hill did not order the electrodiagnostic testing that would have supported such a diagnosis:

> Q:   "Based upon your review of Mrs. Ford's medical records, do you believe the automobile accident on October 7th, 2010 caused her to have torticollis?
>
> A:   . . . "I'm not convinced that . . . it was related to the accident because the timing was certainly not close; and two, I'm not convinced she had torticollis. . . . But generally, to make a confirmed diagnosis . . . you have to generally do that by electrodiagnostic studies . . . . [Dr. Hill] says the head is pulling to the left, but he . . . injects around the scapula. Well, that's not torticollis, either.  Torticollis doesn't involve the scapula in isolation.  So . . . I don't know if she has torticollis or not. . . . I'm not sure she has torticollis because I don't have any description of the features I would look for. "[Y]ou can't say that a year before someone has a whiplash and then a year later gets – started getting torticollis . . . that's not cause and effect.

J.A. at 441-43.  Similarly, Dr. Cloninger rejected a relationship between the automobile accident and torticollis:

> I don't think you can wait 11 months to have any sort of torticollis. That would occur within the first couple of days, certainly within a

> week or so after the accident itself. . . . there's no association
> between that particular automobile accident and the diagnosis of
> torticollis September 18th, 2010.

J.A. at 211.   Dr. Cloninger also testified that neither the x-rays nor the

MRI that was taken three months after the accident showed any signs

of a straightening of the cervical lordosis.   J.A. at 211-12.

Further evidence that Ford did not have torticollis can be found

from the fact that the diagnosis of torticollis became omnipresent in Dr.

Hill's medical records only when it became the justification for her

Botox shots.   Until BCBS denied approval of Botox for headaches, there

was no mention of torticollis, but afterward, there were persistent

notations of the condition in Dr. Hill's treatment notes.   Meanwhile,

none of Ford's other doctors noticed any restriction of the suppleness of

Ford's neck.   The repeated findings by Dr. Llibre and Dr. Bell that

Ford's neck was supple support Dr. Cloninger's and Dr. Massey's

opinions that Plaintiff did not have torticollis caused by the automobile

accident, and may not have had torticollis at all.

While Ford faults the district court for finding that torticollis is

not ordinarily associated with trauma, that conclusion is entirely

consistent with Dr. Massey's testimony that there had been reports of

torticollis associated with trauma, but that in most cases there was no history of trauma. And, the more important opinion given by both Drs. Massey and Cloninger was that torticollis diagnosed a year after an accident could not have been caused by the accident. Ford offers no argument that overcomes the district court's well-reasoned reliance on the expert opinions of Drs. Massey and Cloninger that Ford did not suffer from torticollis, a straightening of the cervical lordosis, or any other injury as a result of the accident a year before those conditions were diagnosed.

> **2.    By failing to object to Dr. Cloninger's testimony during trial and in post-trial briefs, Ford waived any objection and cannot raise the issue for the first time on appeal.**

Finally, Ford argues, for the first time, that the district court could not properly rely upon the expert testimony presented by the United States because that testimony "did not meet the requirements for competent expert opinion," Pl. Br. at 12, suggesting that the testimony was not stated in terms "of a 'reasonable degree of medical certainty,'" *id.* (quoting *Fitzgerald v. Manning*, 679 F.2d 341, 350 (4th Cir. 1982)). As an initial matter, Ford failed to object to the competency

of the expert testimony presented by the United States in the district court, waiving any argument that the district court could not fairly consider that testimony. *See* Fed. R. Evid. 103(a); *United States v. Vogt*, 910 F.2d 1184, 1192 (4th Cir. 1990) *see also Zolfaghari v. Sheikholeslami*, 943 F.2d 451, 454 n.2 (4th Cir. *1991)(*"For an error not raised at the time when the district judge finally rules, at trial . . . to be considered on appeal there must . . . [be] plain error"); *cf. DiPaola v. Riddle*, 581 F.2d 1111, 1113 (4th Cir. 1978)("The trial judge should have the first opportunity to rule upon objections to evidence . . . . Ordinarily, a party should not be permitted to stand silently by and later to contest the admissibility of crucial evidence only after the fact finding has gone against him.").

Having forfeited the right to raise issues on appeal pertaining to Dr. Cloninger's testimony by failing to make a contemporaneous objection at trial, Ford again forfeited the right to raise the issues on appeal by failing to raise the issue in post-trial submissions when the district court could have addressed the issues. Following the trial, the district court provided the parties the opportunity to submit a written closing argument brief, proposed findings of fact, and reply brief. Two

months after the trial, with the benefit of the trial transcript, Ford did

not raise the issue of the competence of Dr. Cloninger's testimony in her

closing argument (ECF No. 48), proposed findings of fact (No. 49), or

reply brief (No. 53).  She cannot now raise those issues for the first time

on appeal.

This Court's "'rule [which] is well settled that only in

extraordinary cases will questions, of whatever nature, not raised and

properly preserved for review in the trial court, be noticed on appeal.'"

*United States v. Maxton*, 940 F.2d 103, 105 (4th Cir. 1991)(quoting

*Hutchinson v. Fidelity Inv. Ass'n*, 106 F.2d 431, 436 (4th Cir.

1939)(Parker, C.J.)).  Similarly, the Supreme Court has emphasized:

"'No procedural principle is more familiar to this Court that a . . . right

may be forfeited in criminal as well as civil cases by the failure to make

timely assertion of the right before a tribunal having jurisdiction to

determine it.'" *Puckett v. United States*, 556 U.S. 129, 134

(2009)(quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944)).  As

the Supreme Court explained:

> If an error is not properly preserved, appellate-court authority to
> remedy the error . . . is strictly circumscribed. There is good
> reason for this; anyone familiar with the work of courts
> understands that errors are a constant in the trial process, that

most do not much matter, and that a reflexive inclination by appellate courts to reverse because of unpreserved error would be fatal. . . .  This limitation on appellate-court jurisdiction serves to induce the timely raising of claims and objections, which gives the district court the best opportunity to consider and resolve them. That court is ordinarily in the best position to determine the relevant facts and adjudicate the dispute. . . .  [T]he district court can often correct or avoid the mistake so that it cannot possibly affect the ultimate outcome. And of course the contemporaneous-objection rule prevents "sandbagging" the court – remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor.

*Puckett*, 556 U.S. at 134 (citations and quotations omitted).

This Court may consider an issue raised for the first time on appeal only if the standard for noticing plain error under *United States v. Olano*, 507 U.S. 725 (1993) is satisfied.  *In re Celotex Corp.*, 124 F.3d 619, 630-31 (4th Cir. 1997); *see Brickwood Contractors, Inc. v. Datanet Engineering, Inc.*, 369 F.3d 385, 396 (4th Cir. 2004).  Under *Olano*, when a party fails to preserve an evidentiary issue through a timely objection, an appellant must show that the district court erred, that its error was plain, and that its error affected the appellant's substantial rights.  *Brickwood*, 369 F.3d at 396; *see Olano,* 507 U.S. at 732.

Ford has failed to meet any of the *Olano* requirements, and even if each of these requirements was satisfied, this Court will exercise its discretion to correct the error only if the error seriously affects the

fairness, integrity, or public reputation of judicial proceedings. *Brickwood*, 369 F.3d at 397. To establish that the error affected his substantial rights, satisfying the third prong of the *Olano* test, the appellant must show prejudice such that it "affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734.

Ford has failed to satisfy the *Olano* test. First, Ford has failed to establish that Dr. Cloninger's testimony was admitted in error. Dr. Cloninger supported his medical opinions with a thorough examination of the medical records and thoughtful analysis. J.A. at 190-91, 192-229. Second, Ford failed to establish the admission of Dr. Cloninger's testimony was "plain error," which *Olano* has defined as "clear" or "obvious," *Olano*, 507 U.S. at 734, since Dr. Cloninger is a board-certified neurosurgeon testifying based on his forty years of experience in the field of neurosurgery. J.A. at 238. Third, Ford failed to establish that admission of Dr. Cloninger's testimony affected her substantial rights since Ford, through her very capable counsel, vigorously cross-examined Dr. Cloninger. Additionally, Ford failed to establish that the exclusion of portions of Dr. Cloninger's testimony would affect the outcome of the trial since Dr. Massey's testimony, which was expressly

55

based on a reasonable degree of medical certainty, J.A. at 382, 488-89,

complemented and buttressed Dr. Cloninger's testimony in all pertinent

areas. *See* JA 369-498. Accordingly, Ford failed to satisfy *Olano* plain

error standard and cannot for the first time raise issues regarding Dr.

Cloninger's testimony on appeal.

Both Drs. Massey and Cloninger testified convincingly that none

of Ford's medical conditions were either caused or exacerbated by the

car accident. Both physicians compared the evidence of the existence

and severity of her medical conditions before the accident with the x-

rays and MRI, as well as treatment reports after the accident, and did

what experts are empowered to do: provide an opinion as to whether

the accident caused or exacerbated any of Ford's medical conditions.

Their opinions were that the accident did not cause or worsen any

medical condition, and they explained the bases for their opinions,

warranting the district court's reliance on those opinions to support its

findings of fact.[3]

---

[3] Ford's assertion that the district court's credibility determinations are not entitled
to deference because "the facts surrounding the impact of the collision on Ms. Ford's
body and the findings of Dr. Hill and his assistant . . . were undisputed," Pl. Br. at
12, is simply wrong. First, the question of whether the car accident caused or
worsened any of Ford's medical conditions was not at all undisputed. Second,
Ford's reliance on *Hicks v. United States*, 368 F.2d 626 (4th Cir. 1966), for the

## CONCLUSION

For all of the reasons set forth herein, the judgment of the district court should be affirmed.

### REQUEST FOR DECISION ON THE BRIEFS
### WITHOUT ORAL ARGUMENT

The United States does not believe that oral argument will assist the Court in any material way and requests that this appeal be decided on the briefs.

Respectfully submitted,

JILL WESTMORELAND ROSE
ACTING UNITED STATES ATTORNEY

*s/ Gill P. Beck*
Gill P. Beck
NC State Bar # 13175
Assistant United States Attorney
United States Courthouse
100 Otis Street
Asheville, NC 28801

---

proposition that a district court's conclusions that are based on undisputed facts are not entitled to the same deference as other findings of fact ignores the 1985 amendments to Fed. R. Civ. P. 52(a) that clarified that *all* findings of fact are entitled to deference by the appellate court and this Court's acknowledgment that "the ruling in *Hicks* on this point has to a large degree been abandoned," *Bonds v. Mortensen and Lange*, 717 F.2d 123, 125 (4th Cir. 1983). As this Court explained in *United States v. Stevenson*, 396 F.3d 538 (4th Cir. 2005), "even when findings of fact are not based on observations of credibility, but rather on undisputed evidence or entirely on documentary evidence, appellate courts must nonetheless defer to the trial court's fact-finding function." *Id.* at 543.

TEL: 828-259-0645
Gill.Beck@usdoj.gov

Of Counsel:

Major Adam Hill
Torts Branch
Litigation Division
9275 Gunston Road, 3d Floor
U.S. Army Legal Services Agency
Fort Belvoir, Virginia 22060

Stephen P. DeLange
Deputy District Counsel
U.S. Army Corps of Engineers
Wilmington District
65 Darlington Ave
Wilmington, N.C. 28403

## <u>CERTIFICATION OF COMPLIANCE</u>

      1.    This Brief has been prepared using (select and complete only one):

<u> 12,125 </u>  Fourteen point, proportionally spaced, serif typeface (such as CG Times or Times New Roman, NOT sans serif typeface such as Arial). Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, CG Times, 14 point): <u>Microsoft Word 2010, Century Schoolbook, 14 point</u>

<u>   </u>  Twelve point, monospaced typeface (such as Courier or Courier New). Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, Courier 12 point):

      2.    EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains (select and complete only one):

      3.<u>   </u>  Pages (give specific number of pages; may not exceed 30 pages for opening or answering brief or 15 pages for reply brief); OR

<u> </u> Words (give specific number of words; may not exceed 14,000 words for opening or answering brief or 7,000 for reply brief); OR

<u>     </u> Lines of Monospaced Type (give specific number of lines; may not exceed 1,300 lines for opening or answering brief or 650 for reply brief; may be used ONLY for briefs prepared in monospaced type such as Courier or Courier New).

      I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

***s/ Gill P. Beck***
Gill P. Beck
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 28th day of September, 2015, a copy of the above was served upon Plaintiff herein by serving his attorneys of record, David Phisko, through electronic case filing.

***s/ Gill P. Beck***
***Gill P. Beck***